IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

**UNITED STATES OF AMERICA,**

v.   **CRIMINAL NO. 2:19cr164**

**JUAN GABRIEL RODRIGUEZ-
PRECIADO,**

   **Defendant.**

## OPINION AND ORDER

On October 2, 2019, a federal grand jury sitting in Norfolk named defendant Juan Gabriel Rodriguez-Preciado ("Defendant") and four co-defendants in a thirteen-count criminal indictment, charging Defendant with: Conspiracy to Distribute and Possess with Intent to Distribute Cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(B) (Count One); and Distribution of Cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2 (Count Ten). ECF No. 3. On April 24, 2020, Defendant, through counsel, filed the instant motion to suppress any and all evidence seized pursuant to a search warrant for 6045 Laveta Drive in Richmond, Virginia executed on August 29, 2019, in connection with a law enforcement investigation into a drug trafficking organization in the Richmond area ("Motion to Suppress" or "Motion"). ECF No. 122. In his Motion, Defendant asserts that all evidence—specifically, the incriminating statements Defendant made during a custodial interrogation after Defendant was found and arrested during the execution of a search warrant at 6045 Laveta Drive, Richmond, Virginia—should be suppressed on two grounds. Id. at 1. First, because Defendant's waiver of his Miranda rights was not knowing or intelligent ("Fifth Amendment Violation"); and second, there was no probable

1

cause for the search warrant for 6045 Laveta Drive ("Fourth Amendment Violation"). Id. at 3, 6.

The United States ("Government") filed its response to Defendant's Motion to Suppress on May 8, 2020 ("Government's Response"). ECF No. 123. On July 16, 2020, the Court held a hearing concerning the Defendant's Motion to Suppress ("Motion to Suppress Hearing"). ECF No. 142. During the Motion to Suppress Hearing, Defendant, through counsel, proffered one witness, Chesapeake Police Department Detective Ashley Souther, who applied for and obtained the presently disputed search warrant for 6045 Laveta Drive. Id. At the conclusion of Detective Souther's testimony, defense counsel withdrew Defendant's Fifth Amendment Violation. As a result, the Government did not proffer any additional witnesses during the Motion to Suppress Hearing. Therefore, for the purposes of this Opinion and Order, the Court need not discuss Defendant's previously alleged, now-withdrawn Fifth Amendment Violation. The Court will only discuss Defendant's Motion to Suppress based on the alleged Fourth Amendment Violation. For the reasons stated herein, Defendant's Motion to Suppress is hereby **DENIED**.

## I. FACTUAL FINDINGS[1]

### A. OVERVIEW OF THE INVESTIGATION

In July of 2019, law enforcement began a multi-agency investigation into a drug trafficking organization ("DTO") in the Richmond area. The DTO was responsible for distributing cocaine and collecting proceeds of such drug sales in the Eastern District of Virginia. Law enforcement learned through a reliable confidential defendant ("Confidential Defendant" or "CD"), that the three main individuals of the DTO were: Adian Barth ("Mr. Barth"), Corey Evans ("Mr. Evans"), and Derrick Lewis ("Mr. Lewis"). According to the Confidential Defendant, Mr. Barth was the

---

[1] The facts described in this section are drawn from the evidence presented at the July 16, 2020 Motion to Suppress Hearing unless otherwise stated.

leader of the DTO, Mr. Evans was the debt collector, and Mr. Lewis was second in line for the narcotics aspect. Law enforcement also learned from the Confidential Defendant that the DTO was a large scale narcotics organization, responsible for distributing large quantities of cocaine, and using multiple houses in the Richmond area as stash houses to maintain some of their illegal contraband and U.S. currency. The Confidential Defendant also told law enforcement that the DTO's stash houses were possibly also the homes that Mr. Barth was professionally flipping. The Confidential Defendant, however, did not provide law enforcement with any specific addresses for the alleged stash houses.

Based the Confidential Defendant's information,[2] law enforcement set up E911 on Mr. Barth's and Mr. Evans' phones, and conducted physical and electronic surveillance on the DTO members including but not limited to their home residences—10924 Sunset Hills Drive North Chesterfield, Virginia ("Sunset Hills Drive"); 4107 Mallard Landing Circle #204 Midlothian, Virginia ("Mallard Landing Circle"); and 6044 Shiloh Place Mechanicsville, Virginia ("Shiloh Place") and any business or residences that showed up on E911 pings—specifically a residence located on 6045 Laveta Drive Richmond, Virginia ("Laveta Drive"); as well as an automobile dealership on 10 Westover Hills Boulevard #D Richmond, Virginia ("Westover Hills Boulevard"). As a part of its investigation, law enforcement also conducted multiple controlled buys from the DTO.[3]

B.  THE WARRANTS

Based on this information, on August 28, 2019, Chesapeake Police Department Detective

---

[2] In the Government's Response, the Government states that "[l]aw enforcement was able to corroborate information provided by the confidential source through law enforcement databases, physical and electronic surveillance, and multiple controlled buys from members of the DTO." ECF No. 123 at 2.

[3] Law enforcement conducted three controlled purchases from the DTO between July and August 2019. ECF 123 at 11.

Ashley Souther ("Detective Souther"), a member of the law enforcement team investigating the DTO, submitted to a state magistrate in Chesapeake, Virginia ("Chesapeake Magistrate") an affidavit ("Original Affidavit") in support of a search warrant for five target locations:

- Sunset Hills Drive (Target Location One);
- Mallard Landing Circle (Target Location Two);
- Laveta Drive (Target Location Three);
- Westover Hills Boulevard (Target Location Four); and
- Shiloh Place (Target Location Five)

See Def. Ex. 1. The Original Affidavit included "facts and circumstances" pertaining to each of the five target locations. The specific facts and circumstances pertaining to the presently disputed Laveta Drive (Target Location Three), included:

> On July 31[st], at approximately 1617 hours, the investigative team went by TARGET LOCATION [THREE] and observed a blue Nissan van bearing Virginia registration URT5016 parked in the driveway. The van is registered to LEWIS.
>
> On August 7[th], surveillance was conducted on BARTH, who was seen at TARGET LOCATION [THREE] for several minutes. Based on the E911 pings, BARTH and EVANS have routinely spent hours at TARGET LOCATION [THREE] on multiple different dates.

Def. Ex. 1 at 2. A separate attachment also stated that, based on Detective Souther's training and experience in narcotics investigations, she knew "that individuals trafficking narcotics often use various locations to store the illegal narcotics, ledgers, U.S. currency, packing materials, and other indicia commonly associated with the distribution of narcotics." Id. at 4.

In response to Detective Souther's Original Affidavit in support of the application for a search warrant for the five target locations listed above, the Chesapeake Magistrate issued a search warrant, at approximately 7:11 p.m. on August 28, 2019, permitting law enforcement officers to search Sunset Hills Drive (Target Location One), Mallard Landing Circle (Target Location Two), and Shiloh Place (Target Location Five). The Chesapeake Magistrate, however, refused to issue a search warrant permitting law enforcement officers to search Laveta Drive (Target Location

4

Three) and Westover Hills Boulevard (Target Location Four).

After being denied a search warrant for Laveta Drive (Target Location Three) and Westover Hills Boulevard (Target Location Four), Detective Souther departed Chesapeake, Virginia. She and her partner drove straight to Chesterfield, Virginia, where the law enforcement team investigating the DTO was scheduled to meet for a briefing regarding the execution of the search warrant permitting law enforcement officers to search Sunset Hills Drive (Target Location One), Mallard Landing Circle (Target Location Two), and Shiloh Place (Target Location Five) at around 3:00 a.m. While in route to Chesterfield, Virginia, Detective Souther reached out to a Chesapeake Commonwealth Attorney. Based on the Chesapeake Commonwealth Attorney's advice, Detective Souther revisited her case notes—including but not limited to law enforcement's surveillance notes, notes memorializing law enforcement's conversations with the Confidential Defendant, and controlled buy notes—and revised the Original Affidavit for Laveta Drive (Target Location Three) and Westover Hills Boulevard (Target Location Four) to include additional information about both locations ("Revised Affidavit"). Detective Souther made these revisions on her laptop computer while her partner drove them to Chesterfield, Virginia.

Because Detective Souther revised the Original Affidavit while traveling to Chesterfield, Virginia, which is approximately 99 miles from Chesapeake, Virginia, Detective Souther did not present the Revised Affidavit to the Chesapeake Magistrate that initially reviewed the Original Affidavit and denied her search warrants for Laveta Drive (Target Location Three) and Westover Hills Boulevard (Target Location Four). Instead, Detective Souther presented the Revised Affidavit to a state magistrate in Chesterfield, Virginia ("Chesterfield Magistrate"), where Detective Souther was now located. In fact, the Chesterfield Magistrate was located in the same area where law enforcement was scheduled to have its briefing prior to taking actions early the

following a.m., which is approximately one and half to two hours (about 99 miles) from Chesapeake, where the first magistrate—Chesapeake Magistrate—was located. Detective Souther advised the Chesterfield Magistrate that the Chesapeake Magistrate previously denied a search warrant permitting law enforcement officers to search Laveta Drive (Target Location Three) and Westover Hills Boulevard (Target Location Four), and that she added additional information to the Revised Affidavit regarding Laveta Drive (Target Location Three) and Westover Hills Boulevard (Target Location Four). Detective Souther testified during the Motion to Suppress Hearing that she had knowledge of the information she added to the Revised Affidavit prior to submitting the Original Affidavit to the Chesapeake Magistrate, but did not originally include it because she believed she had enough to establish probable cause.

At approximately 11:30 p.m., on August 28, 2019, the Chesterfield Magistrate issued state search warrants for Laveta Drive (Target Location Three) and Westover Hills Boulevard (Target Location Four). Def. Ex. 2 at 1–5. The additional information added to facts and circumstances pertaining to the presently disputed Laveta Drive (Target Location Three) included:

> On July 29th, utilizing the E911 pings on BARTH and EVANS' phones, the investigative team was able to locate BARTH's black Infiniti (UTM9020) and EVAN's Tahoe at 6045 Laveta Dr[.], herein referred to as TARGET LOCATION [THREE]. After approximately an hour, the pair left TARGET LOCATION [THREE] in their respective vehicles.
>
> On July 31[st], at approximately 1617 hours, the investigative team went by TARGET LOCATION [THREE] and observed a blue Nissan van bearing Virginia registration URT5016 parked in the driveway. The van is registered to LEWIS.
>
> On August 7th, surveillance was conducted on BARTH, who was seen at TARGET LOCATION [THREE] for several minutes. Based on the E911 pings, BARTH and EVANS have routinely spent hours at TARGET LOCATION [THREE] on multiple different dates.
>
> During an interview with the CD, the CD advised to members of the investigative team that BARTH had recently purchased a box truck. This box truck was observed by members of the investigative team at TARGET LOCATION [THREE] on

6

>August 27th, 2019. The CD further advised that BARTH and his coconspirators are currently using a "stash" location to maintain some of their illegal contraband and U.S. currency.
>
>Your affiant also was able to receive information from the GPS tracker showing LEWIS' vehicle parked at TARGET LOCATION [THREE] on August 28th, 2019, for less than two minutes.

Id. at 8. The Revised Affidavit included the same attachment that stated, based on Detective Souther's training and experience in narcotics investigations, she knew "that individuals trafficking narcotics often use various locations to store the illegal narcotics, ledgers, U.S. currency, packing materials, and other indicia commonly associated with the distribution of narcotics." Id. at 11.

The following morning, on August 29, 2019, at approximately 6:00 a.m., law enforcement teams investigating the DTO simultaneously executed the search warrants for the five target locations. Drug Enforcement Administration Task Force Officer Richard Stocks ("DEA TFO Stocks") was the team leader for executing the Laveta Drive (Target Location Three) search warrant ("Laveta Drive Search Warrant"). Detective Souther was not present during the execution of the Laveta Drive Search Warrant. Instead, Detective Souther was part of the law enforcement team executing the search for Sunset Hills Drive (Target Location One), where she remained until the individual detained at that location was in custody.

During the execution of the Laveta Drive Search Warrant, Defendant was detained. ECF No. 123 at 4. DEA TFO Stocks advised Defendant of his Miranda rights in English at approximately 8:20 a.m. on August 29, 2019. Id. In response to DEA TFO Stocks' questions, Defendant provided detailed information about the DTO and his involvement with the DTO. Id. at 5. Defendant was subsequently arrested and transported to the Richmond Drug Enforcement Administration ("DEA") office, where he was subject to a custodial interrogation with local DEA

agents and the Chesapeake Police Department. Id.; ECF No. 122 at 2. During this custodial interrogation, which was audio-recorded and lasted approximately forty-seven (47) minutes, Defendant made incriminating statements regarding his involvement with the DTO. ECF No. 122 at 2, 3; ECF No. 123 at 5.

## II.  LEGAL STANDARD

"At a hearing on a motion to suppress, the credibility of the witness and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." United States v. McKneely, 6 F.3d 1447, 1452–53 (10th Cir. 1993); see United States v. Massey, 257 F. App'x. 662, 664 (4th Cir. 2007); Columbus–Am. Discovery Group v. Atl. Mut. Ins. Co., 56 F.3d 556, 567 (4th Cir. 1995). As a general rule, the burden of proof is on the defendant who seeks to suppress the evidence. United States v. Dickerson, 655 F.2d 559, 561 (4th Cir. 1981). Once the defendant establishes a basis for his suppression motion, the burden shifts to the government. United States v. Matlock, 415 U.S. 164, 177–78 n.14 (1974).

A court reviewing a magistrate's determination of probable cause does not assess the existence of probable cause de novo. Massachusetts v. Upton, 466 U.S. 727, 728 (1984) (per curiam). Rather, the district court must only ascertain whether "the magistrate had a substantial basis for concluding that probable cause existed." Illinois v. Gates, 462 U.S. 213, 238–39 (1983) (internal quotations omitted). In doing so, courts should accord the magistrate's determination "great deference," and should not invalidate warrants by "interpreting [them] in a hypertechnical, rather than commonsensical, manner." Gates, 462 U.S. at 236 (internal quotations omitted). "Where, as here, a defendant challenges the sufficiency of an affidavit underlying a search warrant, a reviewing court may look only at the information actually provided to the magistrate in the

warrant application process." United States v. Morton, No. 3:17-CR-161, 2018 WL 701281, at *3 (E.D. Va. Feb. 2, 2018), aff'd, 740 F. App'x 320 (4th Cir. 2018).

## III. DISCUSSION

In the instant Motion to Suppress, Defendant argues that the incriminating statements he made during his custodial interrogation must be suppressed based on a violation of his Fourth Amendment rights.[4] ECF No. 122 at 2.

### A. APPLICABLE LAW

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. It requires that searches and seizures be reasonable. Riley v. California, 573 U.S. 373, 382 (2014) (citing Brigham City v. Stuart, 547 U.S. 398, 403 (2006)). In determining reasonableness, the intrusion on the individual's Fourth Amendment interests must be balanced against its promotion of legitimate government interests. United States v. Villamonte-Marquez, 462 U.S. 579, 588 (1983).[5]

Generally, the reasonableness requirement of the Fourth Amendment requires that law enforcement obtain a judicial warrant before performing a search or seizure. Id. (citing Vernonia School Dist. 47J v. Acton, 515 U.S. 646, 653 (1995)). An application for a search warrant must provide a basis for a magistrate to find that there is probable cause for a search. See United States v. Gary, 528 F.3d 324, 328 (4th Cir. 2008). Probable cause requires that, given the totality of the

---

[4] As stated above, during the Motion to Suppress Hearing, Defendant, through counsel, withdrew his Fifth Amendment Violation.

[5] Warrantless searches and seizures are generally presumed to be unreasonable under the Fourth Amendment, and the Government bears the burden of proving by a preponderance of the evidence that such search or seizure is lawful. United States v. Napan, 769 F. Supp. 2d 969, 971 n.2 (E.D. Va. 2011) (citing Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971) ("The burden is on those seeking the exemption [from the Fourth Amendment's restrictions on searches] to show the need for it.")).

circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238. Probable cause does not require that there be an "absolute certainty" that evidence of a crime will be found. Gary, 528 F.3d at 327. Rather, it requires that there is a "fair probability" that such evidence will be found. Gates, 462 U.S. at 238. "Probable cause is 'a fluid concept-turning on the assessment of probabilities in particular factual contexts,'" Gates, 462 U.S. at 232, and exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found.'" United States v. Redd, No. CRIM. 5:07-CR-000035, 2007 WL 2903707, at *1 (W.D. Va. Oct. 3, 2007), aff'd, 341 F. App'x 864 (4th Cir. 2009) (citing Ornelas v. United States, 517 U.S. 690, 696 (1996)).

The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") has held that direct evidence linking the residence to criminal activity is not required to establish probable cause. "Instead, probable cause to search can be based on an accumulation of circumstantial evidence that together indicates a fair probability of the presence of contraband at [the place to be searched]." United States v. Burton, 288 F.3d 91, 103 (3d Cir. 2002); United States v. Stewart, 21 F.3d 426 (4th Cir. 1994) ("Probable cause may be established by circumstantial evidence."). In fact, the Fourth Circuit has held "a sufficient nexus can exist between a defendant's criminal conduct and [the place to be searched] even when the affidavit supporting the warrant 'contains no factual assertions directly linking the items sought to [that place].'" United States v. Christian, No. 1:16-CR-207 (LMB), 2017 WL 2274328, at *9 (E.D. Va. May 24, 2017), aff'd, 737 F. App'x 165 (4th Cir. 2018) (quoting United States v. Grossman, 400 F.3d 212, 217 (4th Cir. 2005)); United States v. Anderson, 851 F.2d 727, 729 (4th Cir. 1988) ("the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences

of where one would likely keep such evidence."). "Rather, it is 'it is reasonable to suspect that a drug dealer stores drugs in a home to which he owns a key,' even if it is one of several homes." Christian, 2017 WL 2274328, at *14 (quoting Grossman, 400 F.3d at 218).

### B. THE PARTIES' ARGUMENTS

The central assertion of Defendant's Motion to Suppress is that the Revised Affidavit submitted in support of the Laveta Drive Search Warrant was "severely lacking in probable cause" because the facts and circumstances alleged as support for "probable cause for the search of Laveta Drive constitute[d] no more than a mere hunch that there was evidence of criminal activity at the Laveta Drive location." ECF No. 122 at 5–6. In fact, Defendant argues "[t]he only statements relevant to the Laveta Drive location were that three individuals suspected to be involved in a DTO had visited the home over the course of a month." Id. at 6. Defendant argues that "there was no indication in the affidavit that there was any exchange of money at the Laveta Drive address, no testimony to any drugs being present at that address and no controlled purchases at that address." Id. at 6. Therefore, Defendant argues that the Revised Affidavit was "bare bones" and did not provide the Chesterfield Magistrate with a substantial basis for finding probable cause to search Laveta Drive (Target Location 3). Thus, any evidence obtained pursuant to Laveta Drive Search Warrant, including Defendant's incriminating statements, should be suppressed. Id. at 5. Defendant also argues that the good faith exception to the exclusionary rule, set forth in United States v. Leon, 468 U.S. 897, 922 (1984), does not apply here because the Revised Affidavit so obviously lacked indicia of probable cause. Id. at 5–6.

The Government maintains that the Revised Affidavit submitted in support of the Laveta Drive Search Warrant contained ample evidence for the Chesterfield Magistrate to determine that the residence at Laveta Drive was utilized by the DTO to further the aims of the cocaine conspiracy

and would contain evidence of such conspiracy. ECF No. 123 at 11–12. Specifically, the Government argues that the Revised Affidavit articulated the actions taken by law enforcement during the course of its investigation of the DTO, which included physical and electronic surveillance, E911, GPS trackers, and several controlled buys. Id. at 11. Although law enforcement's investigation did not provide a controlled buy from Laveta Drive (Target Location Three), it established three separate controlled buys of cocaine from members of the DTO during July and August 2019. Id. Law enforcement learned through its investigation that the members of the DTO—Mr. Barth, Mr. Evans, and Mr. Lewis—utilized multiple cars and residences in different cities to further the DTO's cocaine conspiracy. Id. In fact, the Revised Affidavit noted that law enforcement learned from the Confidential Defendant that Mr. Barth, the leader of the DTO, was utilizing a stash house(s) to store the DTO's illegal contraband, money, and several vehicles to further the narcotics conspiracy. Id. at 12.

The Government argues that the Revised Affidavit documents the E911 pings and physical surveillance, which established that the DTO members routinely spent time at Laveta Drive (Target Location Three). Id. Specifically, on July 29, 2019, law enforcement located Mr. Barth's black Infiniti and Mr. Evan's Tahoe parked on the driveway at Laveta Drive (Target Location Three) for approximately an hour before the pair left in their respective vehicles. ECF No. 123 at 12. Two days later, on July 31, 2019, law enforcement located Mr. Lewis' blue Nissan van at Laveta Drive (Target Location Three). Id. On August 7, 2019, Mr. Barth was again observed at Laveta Drive (Target Location Three) for several minutes. Id. On August 27, 2019, after learning from the Confidential Defendant that Mr. Barth had recently purchased a box truck, law enforcement observed the box truck at Laveta Drive (Target Location Three). Id. The next day, on August 28, 2019, a GPS tracker showed Mr. Lewis' vehicle parked at Laveta Drive (Target

Location Three) for less than two minutes. Id. Thus, the Government argues that the Revised Affidavit provided reason to believe that that the DTO was trafficking cocaine and that additional evidence of this illegal activity could be found at Laveta Drive (Target Location Three). The Government also argues, that even if this Court finds the Revised Affidavit for the Laveta Drive Search Warrant lacked probable cause, the Court should find that the good faith exception to the Fourth Amendment's exclusionary rule applies. Id. at 13–15 (citing Leon, 468 U.S. at 922).

### C. PROBABLE CAUSE FOR THE LAVETA DRIVE SEARCH WARRANT

The Court disagrees with Defendant and finds that the evidence supporting the Laveta Drive Search Warrant was sufficient to justify the Chesterfield Magistrate's finding of probable of cause. As discussed above, the Fourth Circuit has held that "a sufficient nexus can exist between a defendant's criminal conduct and [the place to be searched] even when the affidavit supporting the warrant 'contains no factual assertions directly linking the items sought to [that place].'" Christian, No. 1:16-CR-207 (LMB), 2017 WL 2274328, at *9 (quoting Grossman, 400 F.3d at 217).

In the instant case, the Chesterfield Magistrate was presented with a detailed recounting of law enforcement's investigation of the DTO and its members and the many locations they were utilizing to attempt to hide their activities. In fact, the Revised Affidavit submitted in support of the Laveta Drive Search Warrant articulated that law enforcement identified an ongoing large-scale drug conspiracy operating in multiple locations in multiple municipalities and distributing a significant amount of cocaine in the Eastern District of Virginia. Law enforcement developed a confidential source—the Confidential Defendant—and based on the information provided by the Confidential Defendant, who had been deemed reliable, law enforcement determined that Mr. Barth, Mr. Evans, and Mr. Lewis were the members of the DTO. Law enforcement also learned

that the DTO utilized multiple cars and residences in different multiple municipalities to further its conspiracy. Specifically, law enforcement learned from the Confidential Defendant that the DTO was possibly utilizing homes that Mr. Barth, the leader of the DTO, was professionally flipping as stash houses. Although the Confidential Defendant did not provide law enforcement with any specific addresses, law enforcement used the Confidential Defendant's information as well as certain surveillance operations to locate residences used as suspected stash houses. It is through these surveillance operations that law enforcement located Laveta Drive (Target Location Three). The Revised Affidavit documents five specific instances where law enforcement, either through physical surveillance, E911 pings, or GPS tracking, observed the members of the DTO using various vehicles at Laveta Drive (Target Location Three). Additionally, the Revised Affidavit states based on Detective Souther's "training and experience, it is known that individuals trafficking narcotics often use various locations to store the illegal narcotics, ledgers, U.S. currency, packing materials, and other indicia commonly associated with the distribution of narcotics." Def. Ex. 2 at 11.

In viewing the totality of the circumstances in this case, the Court finds that the Revised Affidavit submitted in support of the Laveta Drive Search Warrant made the necessary showing of probable cause for issuance of the Laveta Drive Search Warrant. Specifically, the Court finds that the facts from the Revised Affidavit discussed above provided a sufficient nexus linking Laveta Drive (Target Location Three) as a stash house for the DTO's illegal contraband, which was distributed by the DTO, and the U.S. currency from these drug transactions. The Confidential Defendant's corroborated statements coupled with law enforcements observations of DTO members periodic coming and going from Laveta Drive (Target Location Three) in various vehicles known by to be owned and operated by the DTO reasonably suggested the use of the

premises as a stash house. See United States v. Jeffries, 2008 U.S. Dist. LEXIS 1395 (W.D. Ky. Jan. 4, 2008). Thus, the totality of these circumstances sufficiently raises a fair probability that the DTO was utilizing the residence at Laveta Drive (Target Location Three) as a stash house to further the aims of the conspiracy and would likely contain evidence of a cocaine conspiracy. United States v. Ramirez, No. 3:13-CR-82-CRS, 2016 WL 11214628, at *10 (W.D. Ky. Dec. 9, 2016), report and recommendation adopted, No. 3:13CR-82-CRS, 2017 WL 384276 (W.D. Ky. Jan. 27, 2017) (denying defendant's motion to suppress and finding that a search warrant to search a suspected stash house proffered sufficient probable cause); United States of America v. Damian Lopez-Gonzalez (21), et al., No. 1:07-CR-279-CAP-GGB, 2008 WL 11348420, at *2 (N.D. Ga. Oct. 2, 2008), report and recommendation adopted sub nom. United States v. Lopez-Gonzalez, No. 1:07-CR-279-CAP-GGB, 2008 WL 11348310 at *2 (N.D. Ga. Oct. 29, 2008) (same).

Because the Revised Affidavit proffered sufficient evidence that there was a "fair probability that contraband," Gates, 462 U.S. at 238, would be found at 6045 Laveta Drive, the Laveta Drive Search Warrant was validly sought and approved, and the Court will not suppress the evidence that resulted from the search of that property. Accordingly, suppression of Defendant's incriminating statements made during his custodial interrogation at the Richmond DEA office is not warranted.

### D. GOOD FAITH

Even if Defendant could establish the absence of probable cause—which he cannot—the good faith exception to the exclusionary rule, set forth in United States v. Leon, applies to this search because the officers relied in good faith on a facially valid warrant.

"When applicable, the exclusionary rule 'forbids the use of improperly obtained evidence at trial.'" United States v. Woodley, No. 4:19CR85, 2020 WL 1302515, at *7 (E.D. Va. Mar. 19,

2020) (quoting Herring v. United States, 555 U.S. 135, 139 (2009)). However, the United States Supreme Court carved out a "good-faith" exception to the exclusionary rule in United States v. Leon. 468 U.S. at 925. Under the good faith exception, the Fourth Amendment's exclusionary rule does not apply where law enforcement officers seize evidence in reasonable, good-faith reliance on a search warrant that is subsequently found to be unsupported by probable cause. Leon, 468 U.S. at 922.

However, Leon identifies four situations in which the good faith exception does not apply: (1) where the magistrate was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the magistrate wholly abandoned his judicial role; (3) where an affidavit so lacked indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where the warrant was so facially deficient, by failing to identify the places to be searched or the things to be seized, that an officer could not reasonably presume it to be valid. Id. at 923.

In the instant case, Defendant argues that Leon is inapplicable because the Laveta Drive Search Warrant, which is based on a bare bones affidavit, fits within the third Leon exception. "The third exception applies when 'the warrant was based on an affidavit that was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" Christian, No. 1:16-CR-207 (LMB), 2017 WL 2274328, at *11 (internal citation omitted). "An affidavit is 'bare bones' when an affiant merely recites the conclusions of others without corroboration or independent investigation of the facts alleged." United States v. Jenkins, 666 F. App'x 321, 324 (4th Cir. 2016).

This argument is without merit, as the Revised Affidavit was not so lacking in indicia of probable cause that the items seized during the execution of the Laveta Drive Search Warrant

should be suppressed. As detailed above, evidence from the E911 pings and law enforcement's physical surveillance coupled with the Confidential Defendant's corroborated information regarding the DTO's stash houses and Mr. Barth's box truck plainly supported the Chesterfield Magistrate's determination that there was probable cause justifying the Laveta Drive Search Warrant. Whether probable cause existed is thus not a close enough issue to demand consideration of the separate question of whether there was "merely sufficient indicia of probable cause to justify application of the Leon good faith exception." United States v. Williams, 548 F.3d 311, 319 (4th Cir. 2008).

Furthermore, even assuming the Revised Affidavit failed to provide a sufficient nexus between the evidence and Laveta Drive (Tafrget Location Three), the absence of probable cause was not so obvious as would preclude reasonable reliance on the Laveta Drive Search Warrant. In this case, Detective Souther relied on her experience that drug traffickers keep contraband and related evidence in their residences and stash houses. She also identified several pieces of information that would have led a reasonable officer to believe that there was probable cause to search Laveta Drive (Target Location Three)—such as: the DTO operated in the Richmond area, the members of the DTO visited Laveta Drive (Target Location Three) on multiple occasions using different vehicles; and that the DTO utilized stash houses to store its illegal contraband and currency.

Finally, Defendant's attempt to draw corollaries between the instant case and United States v. Woodley during the Motion to Suppression Hearing is flawed. No. 4:19CR85, 2020 WL 1302515, at *7 (E.D. Va. Mar. 19, 2020). In Woodley, the Court was fundamentally concerned with the objective reasonableness of the executing officer's reliance on the warrant, because the officer who executed the warrant was also the author of the bare bones affidavit. Id. at *7 (citing

United States v. Barrington, 806 F.2d 529, 532 (5th Cir. 1986) (finding that the good faith exception does not apply "[i]f one cannot use a bare bones affidavit and then rely on an ignorant colleague to conduct the search, he cannot himself conduct the search based on his own bare bones affidavit.")). This is not the case here, as DEA TFO Stocks—not Detective Souther, the affiant of the Revised Affidavit—executed the Laveta Drive Search Warrant. Contra United States v. Woodley, No. 4:19CR85, 2020 WL 1302515, at *7 (E.D. Va. Mar. 19, 2020) (finding that the officer who was both the affiant of the underlying affidavit in support of the search warrant and the officer who executed the warrant, and "was aware of the evidence known to the officers and not presented in the affidavit in support of the warrant[;]" diluted the officers' good-faith reliance on the warrant); United States v. Lewis, No. 4:19cr52, slip op. at 14 (E.D. Va. Oct. 24, 2019) (finding that the officer who authored the bare bones affidavit and also participated in the execution of the search warrant "does not fall with the ambit of the good faith exception of Leon"). Consequently, even if probable cause is lacking, the good faith exception prevents the application of the exclusionary rule here.

Accordingly, Defendant's Motion to Suppress is denied. ECF No. 122.

### IV.   CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress is **DENIED**. Id.

The Clerk is **DIRECTED** to forward a copy of this Opinion to all Counsel of Record.

**IT IS SO ORDERED.**

/s/
Robert G. Doumar
Senior United States District Judge
UNITED STATES DISTRICT JUDGE

Norfolk, VA
August 5, 2020